A. Lorraine Weekes (CA SBN 332369)
Lorraine@kneuppercovey.com
Kevin Kneupper, Esq. (CA SBN 325413)
Kevin@kneuppercovey.com
Cyclone Covey, Esq. (CA SBN 335957)
Cyclone@kneuppercovey.com
KNEUPPER & COVEY, PC
17011 Beach Blvd., Suite 900
Huntington Beach, CA 92647
Tel: 657-845-3100

*Attorneys for Plaintiff Kendrick Davis and the Class*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KENDRICK DAVIS, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>CLIENTS ON DEMAND, LLC, and RUSSELL RUFFINO, individually and as an officer of CLIENTS ON DEMAND, LLC,<br><br>Defendants. | Case No. 2:23-cv-10541<br><br>**CLASS ACTION COMPLAINT FOR:**<br><br>(1) Fraudulent Inducement;<br>(2) Violations of the Seller Assisted Marketing Plan Act;<br>(3) Violation of California's Consumers Legal Remedies Act;<br>(4) Violation of California's False Advertising Law;<br>(5) Violation of the Unfair and Fraudulent Prongs of California's Unfair Competition Law;<br>(6) Violation of the Unlawful Prong of California's Unfair Competition Law;<br>(7) Breach of Express Warranty; and<br>(8) Breach of Contract.<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Kendrick Davis, by and through the undersigned counsel and on behalf of himself and all others similarly situated, hereby files this Class Action Complaint against Defendants Clients on Demand, LLC, and Russell Ruffino and alleges as follows:

## SUMMARY OF THE CASE

1.     This case is about the use of deceptive and fraudulent advertising to sell online

coaching services.

2.    Defendant Russell Ruffino spearheads this scheme, falsely claiming that, in exchange for thousands of dollars, his company, Defendant Clients on Demand, will do all of the tech, sales, and marketing legwork necessary to build online coaching businesses for consumer-victims like Plaintiff Kendrick Davis.  Defendants falsely promise to deliver a "100% turnkey" coaching business to their clients and claim that they will implement their strategy for their customers "to bring in new clients like clockwork at $5,000 to $10,000 prices or more so you don't have to lift a finger."

3.    Once they've pocketed thousands of dollars from their consumer-victims, Defendants stop pretending they'll do anything to actually build out their consumer-victims' businesses and start offering far less valuable or resource-intensive "coaching services."  These services consist of, e.g., group conference calls and a two-page document with links to hours of video recordings on topics like "Change Your Outlook To Change Your Life" and "Can You Turn Up The Dream And Tune Out The Noise?"  The promised "100% turnkey" coaching business, technological services "all done for you," and concrete deliverables, e.g. a video webinar "done for you," never materialize.   Instead, participants are handed a one-size-fits-all task list of products they must buy, forms they must fill out, and services they must set up *largely themselves*.  Defendants label this offering as a DFY (or "done for you") "funnel set-up service" but, for consumer victims who must spend their time navigating and completing the various tasks they're assigned and their money paying for all the services Clients on Demand directs them to pay for *on top* of what they already paid Clients on Demand for a "100% turnkey" coaching business, it is anything but.

4.    Defendants also lure in consumer-victims with false promises of a risk-free full refund plus $5,000.00 check "just" for trying out Defendants' webinar-forward approaching to generating coaching leads.  In reality, Defendants proffer consumer-victims with an adhesive contract that, confusingly, comes with both a strict no-refunds policy *and* an onerous (and expensive) list of conditions consumer-victims must meet before Clients on Demand will even consider giving them the promised refund plus $5,000.00 check.

5.      Defendant's false and deceptive advertising injures unsuspecting consumers like Plaintiff Kendrick Davis who pay Defendants thousands for a "100% turnkey" coaching business and a full-refund guarantee, and instead, get webinar recordings and long to-do lists, but no refund.

## JURISDICTION AND VENUE

6.      This court has jurisdiction pursuant to 28 U.S.C. section 1332(a)(1) because there is diversity among the Parties and the amount in controversy exceeds $75,000.  Plaintiff is a citizen of Georgia and both Defendants are citizens of California.

7.      This court also has jurisdiction pursuant to 28 U.S.C. section 1332(d) because this is a class action brought on behalf of more than 100 putative class members in which the amount in controversy exceeds $5,000,000 and a member of the Class is a citizen of a State different from that which Defendants are citizens of.

8.      This Court has personal jurisdiction over Defendant Clients on Demand, LLC because it is a California limited liability corporation.

9.      This Court has personal jurisdiction of Defendant Ruffino because he is a citizen of the State of California.

10.      The contract between Plaintiff and Defendant Clients on Demand states that "Jurisdiction and Venue for any dispute concerning, involving, or in any way related to this Agreement shall lie exclusively in the federal and state courts of California State, located in the County of Los Angeles."

11.      Venue is proper in this Court pursuant to 28 U.S.C. section 1391(b)(1) because Defendant Clients on Demand has its principal place of business in Walnut, California.

## THE PARTIES

12.      Plaintiff Kendrick Davis is a citizen of Georgia who offers mentoring and coaching services for troubled youth.  Mr. Davis paid Clients on Demand $9,000.00 for what he was told would be a turnkey coaching business that included a complete website for Mr. Davis, all of the technical backend work necessary to drive clients to Mr. Davis, as well as marketing materials customized for Mr. Davis, including a bespoke marketing video.

13.     Plaintiff is informed and believes that Defendant Clients on Demand, LLC is, and at all times mentioned herein was a limited liability company organized and existing under the laws of the State of California and having its principal place of business at 340 S Lemon Ave #7370, Walnut, California 91789.

14.     Defendant Russell Ruffino is a California citizen.  He is the founder and CEO of Defendant Clients on Demand.  At all relevant times, Defendant Ruffino has formulated, directed, controlled, or participated in the deceptive acts and practices set forth in this complaint.

15.     Plaintiff is informed and believes, and on that basis alleges, that Russell Ruffino is the alter-ego of Clients on Demand because there is such a unity of interest between the two that separate personalities do not exist:

   a.   Clients on Demand, LLC, was suspended by the FTB on or around June 1, 2021; Plaintiff is informed and believes that Defendant Ruffino knowingly solicited business for Clients on Demand, LLC, while its corporate status was suspended;

   b.   Defendant Ruffino ignores corporate formalities insofar as he uses email addresses associated with the domain name "russruffino.com" (rather than with Clients on Demand's domain name "clientsondemand.com") to send e-mail solicitations for Clients on Demand;

   c.   Defendant Clients on Demand ignores corporate formalities insofar as it has, as alleged herein, failed to comply with the requirements of the Seller Assisted Marketing Plan Act;

   d.   Plaintiff is informed and believes that on or around November 2017 Defendant Ruffino treated Clients on Demand's funds as his own by flying his father and other family members — on a private jet that was, on information and belief, chartered with Clients on Demand's funds — to Hawaii for his father's birthday; and

   e.   Defendant Ruffino advertised Clients on Demand's services by telling consumer-victims that if Clients on Demand's Program (for which they were required to

CLASS ACTION COMPLAINT

pay money to Clients on Demand) did not work for them, he would write them a check for $5,000.00 and *personally* enroll in their coaching program, and, in doing so, evidenced the extent to which he treated corporate and personal funds and resources as interchangeable.

## DEFENDANTS' COURSE OF CONDUCT

***Defendants Knowingly and Fraudulently Misrepresent the Scope and Nature of the Services Clients on Demand Offers Through its Eight-Week Program***

16.    Defendants advertise Clients on Demand's services with videos where Defendant Ruffino represents that Clients on Demand will do all of the logistical, marketing, and technical legwork necessary to provide its clients with a successful coaching business.

17.    For example, in one video advertisement, Mr. Ruffino describes how Clients on Demand has turned more newbie coaches into millionaires than any other company and says that he will show consumers how they can "get [his] entire team to implement this thing for you to bring in new clients like clockwork at $5,000 to $10,000 prices or more so you don't have to lift a finger."  He states that he will show consumers how Clients on Demand "can put that same strategy to work for you, *all done for you*."  (The words "all done for you" in the captions scrolling below Mr. Ruffino's face are italicized, suggesting that Clients on Demand will <u>fully</u> implement the strategy Mr. Ruffino is about to describe on its clients' behalf.)

18.    Later the video, Mr. Ruffino describes an alluring dream scenario in which the viewer has built a profitable coaching business: "You have an online group workshop, it's $10,000. You're enrolling new clients into this program like clockwork, you start bringing in $50,000 a month, then $100,000 a month, then more. And since your program is online, you could work from home or you can work from anywhere. You can take your family on any dream vacation you can imagine and still the cash keeps pouring in and you could serve all your clients in just 4 to 5 hours per week and still get them amazing results."

19.    Mr. Ruffino then states that the viewer probably doesn't "know anything about marketing or sales" or "how to do a $10,000 coaching program" or "to do all the miserable tech setup that . . . goes into setting up something like this."  After acknowledging that doing these

things is "damn hard," Mr. Ruffino continues (emphases added):

> And that's why my team and I would love to just **do the whole thing for you**. So here's how that works. If you don't have a high ticket offer yet, **we will build one for you from scratch,** and this **will be an offer that's unique to you,** based on your expertise, that sells for $5,000 to $15,000 or more. It's your best work, and it's something you could be very proud of, and we map out the whole thing for you. Then I'll show you how to enroll your first 5 to 20 high-ticket clients into that workshop, in just the next two weeks. This should create a **huge cash windfall for you in just the first 14 days of our working together**. And then, **my team and I will build out your entire high ticket sales system for you. Ad copy, your web pages, your video, just like this one - all done for you,** so it's perfect. And when everything is said and done, **we're gonna hand you the keys to the high ticket coaching business of your dreams. 100% turnkey and ready to go.**

20.    Clients on Demand also makes misleading misrepresentations in its email marketing.  For example, in one marketing email (which Plaintiff received and is informed and believes is a mass marketing email sent to other members of the Class), Defendant Ruffino invited the reader to "[l]et me turn your expertise into an online coaching business that generates you $100,000 (or more) every month."  Mr. Ruffino wrote that he wanted to "do it," i.e., turn the reader's expertise into a $100,00+ a month coaching business, "for" the reader.

21.    In this email, Mr. Ruffino indicated that if the reader hired Clients on Demand, Defendant Ruffino and his team would be actively involved in building and expanding the reader's business such that their business success would be absolutely guaranteed.  He wrote that he was selling a "a DONE-FOR-YOU program . . . Where my team and I remove all chances of failure by just doing all the heavy lifting for you."

22.    Mr. Ruffino's email also indicated that "[a]vailability is limited," a representation that is consistent with Mr. Ruffino's statements that he was offering resource-intensive services through his "DONE-FOR-YOU" program.

23.    Defendant Ruffino's email regarding the "DONE-FOR-YOU" program indicated that "[s]even days from now, I will be increasing the investment to COD to $20,000. However, right now, you can get it for less than half that."  This statement reflects the fact that COD's Eight-Week Program (for which Defendant Clients on Demand charged Plaintiff $9,000) is the

product being *advertised* as a "DONE-FOR-YOU" program.

24.    The above statements are false and materially misleading in two ways.  First, they misrepresent the nature, quality, and scope of the services Clients on Demand provides through its Clients on Demand Eight-Week Program ("the Program").   And second, they misrepresent the financial outcomes that consumers a likely to see if the purchase Clients on Demand's Program.

25.    The falsity of Mr. Ruffino's advertising representations concerning the "DONE-FOR-YOU" nature of Clients on Demand's program and the fact that his team will "remove all chances of failure by just doing all the heavy lifting for you" is revealed by the fine print in the multi-page contract Clients on Demand has customers enrolling in the Program sign, which states:

> By entering into this Agreement, YOU agree and understand that CLIENTS ON DEMAND is **only granting YOU access to the Program**, which attempts to teach YOU sales and marketing techniques intended to help YOU grow YOUR business. CLIENTS ON DEMAND **guarantees no specific results**, except as Conditionally Guaranteed under Section 2.2 of this agreement. **YOU take full responsibility for YOUR own success**. YOU acknowledge that everyone's success is different and depends on numerous factors, including, but not limited to, YOUR own drive, dedication, and motivation. Any examples of income or testimonials are not meant as a promise or guarantee of YOUR own earnings or success, and YOU should not rely upon them in any manner whatsoever. Please be aware that YOU may experience loss of income by using the Program. In other words, YOU are completely and totally responsible for YOUR own success, and there is a risk YOU may lose money.

26.    Similarly, Defendant Ruffino hawks Clients on Demand's services by claiming that his team will implement Clients on Demand's strategy "for you to bring in new clients like clockwork at $5,000 to $10,000 prices or more so you don't have to lift a finger."  But Clients on Demand's User Agreement requires consumers to "acknowledge that creating results requires tremendous effort and that YOU are prepared and committed to faithfully make that effort."

27.    In reality, Clients on Demand *does not* do all of the logistical, technological, and marketing groundwork necessary to build successful coaching businesses for purchasers of the

Program.  It does not do all the "miserable tech setup" for these purchasers or produce webinar videos for them.  It does not hand purchasers of its Program the keys to a "100% turnkey" coaching business.  All it does is give them access to a to-do list of technical instructions regarding things *the client* must do and pay for plus some pre-recorded videos about mindset and access to a Facebook group and "coaching" calls.

28.    Defendants' use of the phrase "100% turnkey" to describe the coaching businesses Clients on Demand will build for Program participants suggests that, once Clients on Demand is done with the "heavy lifting," the customer will have minimal work, if any, to do before signing up a large number of high-paying customers.  But, as Clients on Demand's own User Agreement recognizes, this is simply not true. Far from doing all of the "heavy lifting" for its customers, Clients on Demand expects its customers to put in "tremendous effort" to build their own businesses, for themselves.

29.    Similarly, while Clients on Demand advertises that its customers will be able to reel in high-paying clients without lifting a finger because it will do all of the legwork for its customers, in reality, it gives purchasers of its Eight-Week Program lengthy to-do lists of tasks that *they* must personally complete, some of them involving the very same "miserable tech setup" that Defendants says they will hand *for* customers.  For some, the volume of videos and complexity of the projects Clients on Demand is instructing them to complete is so great that it is not possible for them to do while also balancing fulltime jobs and household duties.

***Defendants Knowingly and Fraudulently Misrepresent the Nature and Availability of the Refund Offered to Purchasers of Clients on Demand's Eight-Week Program***

30.    In video and written advertisements, Defendants represent that consumers who try their program will not only get a full refund, but also a check for $5,000.00, "just" for trying out Defendants' approach.

31.    In one video, Defendant Ruffino describes former clients who were "complete newbies" when they started working with Clients on Demand and are now allegedly doing millions of dollars a year in business using Clients on Demand's approach.

32.    Defendant Ruffino emphasizes that two of these coaches "were starting

CLASS ACTION COMPLAINT

completely from scratch" when they began working with Clients on Demand and had "[n]o audience, no clients, no authority, no big following." Clients on Demand, Defendant Ruffino says, helped them use a video-driven sales funnel "in their businesses and their income shot up to $10K per month and then $50K and then $100K, and it just kept going up." These clients' success is why, Defendant Ruffino says, he is "so confident that this can work for you too." And, Defendant Ruffino continues, if it doesn't, "I will not only refund you, I will also cut you a check for $5,000 just for trying it out."

33.    Later in the same video, Defendant Ruffino emphasizes that the availability of this refund plus $5,000.00 offer makes trying Clients on Demand essentially risk free: "if you do decide that you want our help to implement this game plan, the whole thing is guaranteed. Again, if it doesn't work for you, not only will I refund every penny you spend with me, but I will also cut you a check for $5,000 and I will become your next high ticket client myself[.] [S]o look, you have absolutely nothing to lose. Click button into this video and schedule that free breakthrough session now."

34.    Similarly, in a May 2022 email advertisement, Defendant Ruffino wrote that "I'm so confident this one simple video can get you an extra 20k, 40k, or even 100k+ per month... That if you try it and it doesn't work – **I'll personally write you a check for $5,000, just for trying.**"

35.    These representations, in particular, their use of the word "just" make it sound as if all one has to do to be entitled to a refund is give Defendants' Eight-Week Program a try. Nothing could be further from the truth.

36.    While Defendant Ruffino promises a full refund <u>plus</u> a five thousand dollar check <u>just</u> for trying out Clients on Demand's video-centric approach to online sales, the contract that his telemarketers push consumers to sign (the User Agreement for Clients on Demand 8-Week Program™) states, in bold, that "**[a]s a general policy, CLIENTS ON DEMAND abides by *a strict no-refund policy*.**"

37.    Confusingly, after noting Clients on Demand's "strict no-refund policy," the User Agreement for Clients on Demand 8-Week Program™ (the User Agreement) continues:

"YOU further acknowledge, represent, warrant and agree that, by entering into this Agreement, YOU are taking full responsibility for YOUR own success and therefore **YOU will not request a refund, unless otherwise eligible and covered by the Conditional Guarantee found in Section 2.2 of this agreement.**"

38.     Defendant Ruffino's offer a full refund plus $5,000.00 <u>just</u> for trying Clients on Demand's video-centric approach to online advertising appears to be straightforward: all a consumer must do to qualify for the refund is "just" try out the video-centric approach to "client attraction" taught in Clients on Demand's Program.  But, in reality, the User Agreement places numerous conditions on eligibility for the refund and $5,000.00 check.  For example, the User Agreement provides that only consumers who have spent more than $2,000.00 on advertising are eligible for a refund.  It also states that eligibility for a refund is contingent upon consumers' signing a Confidential Settlement Agreement.

39.     Though Plaintiff is not in possession of the "Confidential Settlement Agreement" consumer-victims seeking a refund from Clients on Demand must sign, he is informed and believes that it includes a release of legal claims the consumer may have against Clients on Demand.  Thus, the refund is not, as advertised, "just," for trying out Defendants' program.  It is, rather, only available to those who have met all of Defendants' conditions (some of them, like spending $2,000.00 on ads *on top* of the money spent enrolling in Clients on Demand's program, quite costly or time-consuming to complete) <u>and</u> who are willing to give up any legal claims they may have against Clients on Demand.

40.     Similarly deceptive is the massive gap between the implicit definition of what it means for the program to "work" for consumers found in Defendants' advertisements and that found in the User Agreement.  For example in one email, Defendant Ruffino writes "I'm so confident this one simple video can get you an extra 20k, 40k, or even 100k+ per month . . . That if you try it and it doesn't work – **I'll personally write you a check for $5,000, just for trying.**"  In an advertising video, Defendant Ruffino likewise couches the refund offer amidst tales of former Clients on Demand customers who've allegedly earned large amounts of money as a result of enrolling in the Program.

41.     These advertising representations suggest that the Clients on Demand program will "work" for consumers insofar as it will enable them to earn significant amounts of money each month.  But the User Agreement provides that a consumer who has had at least five scheduled calls with potential clients — whether or not they've made any money from those potential clients — is ineligible for any refund.  Put differently, under the terms of the refund offer as defined in the User Agreement, a Clients on Demand customer who has had six sales calls since starting the program but has not made a single dollar is ineligible for the refund or $5,000.0 check because the program has "worked" for them by generating sales calls from which they earned nothing.

## MR. DAVIS'S VICTIMIZATION AT THE HANDS OF CLIENTS ON DEMAND AND DEFENDANT RUSSELL RUFFINO

42.     Plaintiff Kendrick Davis has, for years, has been committed to supporting, mentoring, and uplifting young men and boys of color.

43.     Plaintiff leverages his academic training and life experiences to offer guidance and support to young men who are navigating their tumultuous adolescent years while also dealing with structural racism and urban poverty.

44.     At the time he fell victim of Defendants' scam, Plaintiff had honed his inspiring message but needed technical and logistical assistance to make his dual dream of earning money through his coaching and reaching as many young people as possible a reality.

45.     Plaintiff came across an advertisement for Clients on Demand on social media and scheduled a sales call with Clients on Demand.

46.     On his initial call with Clients on Demand, Mr. Davis was subjected to hard-sales tactics and pressured to hand over his credit card information on that very call.[1]

---

[1]     The FTC, in an article specifically about coaching program scams, warns consumers that "[s]cammers want you to give up your credit card or bank account information first and ask questions later. They know that if you do some research, you might find reports of rip-offs and back out of the deal. . . . Honest business opportunities don't need to use high-pressure sales tactics — an offer that's good today should be good tomorrow, too." "When a Business Offer or Coaching     Program     Is     a     Scam,"     FTC     (August     2022),     *available     at*: https://consumer.ftc.gov/articles/when-business-offer-or-coaching-program-scam  (last   accessed

47.    The telemarketer told Mr. Davis that Clients on Demand would be handling all of the backend and logistical work necessary to build him a successful pipeline of potential clients and a flourishing online coaching business.  The telemarketer emphasized to Mr. Davis that Clients on Demand had a proven track record of developing highly profitable coaching businesses for its clients.  The telemarketer described the Program as a "done-for-you" suite of administrative business services and represented to Plaintiff that by enrolling in the Program for $9,000.00 he would be hiring Clients on Demand to handle all of the administrative and technological work necessary to build, on Plaintiff's behalf and without significant time commitments from Plaintiff, a commercial platform for Plaintiff's mentorship and coaching offerings.

48.    Clients on Demand's pitch was highly attractive to Mr. Davis because he is not technologically savvy at all and does not have significant experience with designing sales funnels, drafting or purchasing online ads, or producing polished promotional videos.

49.    Convinced by the telemarketer's spiel and eager to achieve the financial freedom and success Clients on Demand told him other aspiring coaches routinely attained by hiring it, Mr. Davis agreed to pay Clients on Demand $9,000.00 to handle all the miserable tech setup, sales, and marketing he needed to get his online coaching business off the ground.

50.    Rather than provide Mr. Davis the comprehensive suite of business services and deliverables it had promised, e.g., a website and video "all done for" Mr. Davis and a bursting-at-the-seams lead pipeline, Clients on Demand handed him a giant to-do list and directed him to a veritable torrent of webinars and reading material.

51.    When Plaintiff realized that the bulk of what Clients on Demand was giving him was cookie cutter advice about mindset shifts and how-to guides about online advertising, and not concrete business services and deliverables, he felt tricked and deceived.

October 22, 2023). Russell Ruffino has boasted online about Clients on Demand's pressuring consumers to cough up thousands of dollars on their very first call with Clients on Demand (the same sales strategy the FTC warned consumers about in its August 2022 article).  For example, in a January 12, 2018 Facebook post, Defendant Ruffino advised that one of the "core goals" of an online selling system should be to "[e]nroll on the FIRST call[.] One call.  That's it."

52.     Plaintiff has overcome extreme personal challenges to become a role model and leader in his community; he also mentors and advises the young men he serves about how to develop a positive mindset and imagine lives for themselves that are bigger and better than their current circumstances.  Plaintiff has no need for (and would never have agreed to pay thousands of dollars to listen to) recordings of Defendant Ruffino bloviating about mindset shifts.

53.     Even the portion of Clients on Demand's services that Clients on Demand *labeled* as "Done for You" was not actually *done for you* at all.  As part of its "Done for You" offering, Clients on Demand told Mr. Davis that *he* needed to, among other things, subscribe to the online calendaring software Calendly's pro-plan or higher, setup Facebook business manager, create a Facebook pixel, complete "Domain DNS verification," record and upload various videos, for which he was not provided a script of any sort, and interface with a company called Zapier, which offers web application integration.

54.     What Plaintiff needed (and thought, based on Defendant Ruffino's representations, he was buying) was logistical and technical services and back-end work necessary to build-out a "100% turnkey" coaching business on Plaintiff's behalf without Plaintiff having to devote significant time or resources to these endeavors.  He was told he wouldn't have to "lift a finger" and then was handed a giant to-do list that was misleadingly labeled "done for you."

55.     Clients on Demand did not direct a single coaching client to Mr. Davis. Mr. Davis did not recuperate *any* of the $9,000.00 he paid Clients on Demand through sales to customers directed to him by, or attracted with the use of strategies from, Clients on Demand.

56.     On September 12, 2023, Mr. Davis emailed Clients on Demand requesting the full refund plus five thousand dollars Defendant Ruffino offered if Clients on Demand's video-centric approach to sales did not work for Mr. Davis.  Mr. Davis indicated that he would prefer a check and would be happy to provide his mailing address.

57.     Clients on Demand responded on September 20, 2023, indicating that it would not provide Mr. Davis a refund because he had not, it maintained, complied with several of the onerous, costly, and extremely time-consuming conditions placed on the refund.  For example,

it told him he was ineligible for a refund because he had not spent $2,000.00 on advertising and had not sat through each and every one of the myriad monologues pre-recorded by its staff, for example "Building a Bullet Proof Mindset" and "Protecting Your Dream."

## CLASS ACTION ALLEGATIONS

58.    Pursuant to Federal Rule of Civil Procedure 23, Kendrick Davis, the named Plaintiff, seeks class certification.  Plaintiff proposes the following Class definitions:

**Class:** All natural persons in the United States who, within the applicable statute of limitations period until the date notice is disseminated, purchased Clients on Demand's Eight-Week Program.

**No-Refund or Payment Subclass:** All members of the Class who requested, and were denied, a refund and $5,000.00 payment from Defendants.

**Voidable SAMP Contract Subclass**: All members of the Class who purchased Clients on Demand's Eight-Week Program within one year before the filing of this Class Action Complaint until the date notice is disseminated.

59.    Excluded from the Class are governmental entities, Defendants, any entity in which Defendants have a controlling interest, and Defendants' officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns. Also excluded from the Class is any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

60.    Plaintiff reserves the right to amend or modify the class description by altering it or by making it more specific or by dividing the class members into further subclasses or limiting the issues as appropriate.

61.    **Numerosity:** Plaintiff and the Class are informed and believe, and on that basis allege, that the Class is so numerous that individual joinder of all members would be impracticable. Defendant Ruffino routinely boasts that his company has served thousands of customers and Plaintiff and the Class are informed and believe, and on that basis alleged, that the Class is greater than 100 consumers geographically dispersed throughout the United States.

62.    **Commonality:** Defendant's practices and omissions were, on information and

belief, applied uniformly to all members of the Class such that the questions of law and fact are common to all members of the Class. All members of the putative Class were and are similarly affected by having purchased deceptively-marketed business services from the Defendants and the relief sought herein is for the benefit of Plaintiff and all members of the putative Class.

63.     Questions of law and fact common to the Class exist that predominate over questions affecting only individual members. The common questions of law and fact include:

a.   Whether Defendants market Clients on Demand's business services in a manner that is false or misleading;

b.   Whether the wrongful conduct detailed in this Class Action Complaint constitutes unfair or unlawful business practices;

c.   The extent to which Class members overpaid for the business services they received from Clients on Demand;

d.   Whether the Class is entitled to recover statutory attorney's fees; and

e.   Whether Plaintiff and the Class are entitled to appropriate remedies, including injunctive relief.

64.     **Typicality**: The claims asserted by Plaintiff in this action are typical of the claims of the members of the Class as the claims arise from the same course of conduct by Defendants, all members of the Class have been similarly affected by Defendants' course of conduct, and the relief sought is common.

65.     **Adequacy:** Plaintiff will fairly and adequately represent and protect the interests of the members of the Class. Plaintiff has no interest adverse to the interests of the other Class members. Plaintiff has retained competent counsel with substantial experience in complex litigation and litigation involving consumer issues and Plaintiff's counsel are committed to vigorously prosecuting this action on behalf of the Class.

66.     **Superiority:** A class action is superior to other available methods for the fair and efficient adjudication of the present controversy, in that it will permit a large number of claims to be resolved in a single forum simultaneously, efficiently, and without the unnecessary hardship that would result from the prosecution of numerous individual actions and the

duplication of discovery, effort, expense and burden on the courts that individual actions would engender. The benefits of proceeding as a class action, including providing a method for obtaining redress for claims that would not be practical to pursue individually, far outweigh any difficulties that it might be argued could arise in connection with the management of this class action. These benefits make class litigation superior to any other method available for the fair and efficient adjudication of these claims. Absent a class action, it would be highly unlikely that many members of the Class would be able to protect their own interests because the cost of litigation through individual lawsuits might exceed expected recovery.

67.    Certification of this class action is appropriate because the questions of law or fact common to the respective members of the Class predominate over questions of law or fact affecting only individual members. Certification is also appropriate because, on information and belief, Defendants acted, or refused to act, on grounds generally applicable to the Class, thereby making appropriate the relief sought on behalf of the Class as a whole. Further, given the large number of potentially injured consumers, allowing individual actions to proceed in lieu of a class action would run the risk of yielding inconsistent and conflicting adjudications. Certification of Plaintiff's claims for class-wide treatment is also appropriate because Plaintiff and the Class can prove the elements of the claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

68.    Notice to the members of the Class may be accomplished inexpensively, efficiently, and in a manner best designed to protect the rights of all Class members.  Plaintiff is informed and believes that Defendant Clients on Demand has objective evidence concerning Class members' identities, including without limitation, sales receipts, credit card data, e-mails concerning refund inquiries, and other objective evidence. Class notice can thus likely be directly sent to individual members of the Class.

CLASS ACTION COMPLAINT

### **FIRST CAUSE OF ACTION**

**FRAUDULENT INDUCEMENT**

**(Against both Defendants)**

69.     Plaintiff incorporates all preceding and subsequent paragraphs by reference as if set forth fully herein.

70.     On or around May 2023, Defendant Clients on Demand made a series of false and misleading representations to Plaintiff. These included telling him that Clients on Demand would, in exchange for $9,000.00, handle the back-end logistical work necessary to build him a successful online coaching business and suggesting to him that if he hired Clients on Demand, it was likely that he would earn thousands of dollars a month through his coaching business as a result of the lead pipeline, technical platform, and marketing and sales infrastructure that Clients on Demand would develop for him.

71.     These claims concerning the business services and earnings Clients on Demand' would provide Plaintiff or, with a strong degree of likelihood, enable Plaintiff to earn were "suggestion[s], as a fact, of that which is not true, by one who does not believe it to be true." *See* Cal. Civ. Code § 1572(1).

72.     Defendant Client on Demand's failure to *conspicuously* inform Plaintiff that it would not be providing him logistical and technical services and that it was not highly likely that he would see very large earnings quickly after hiring Clients on Demand constituted "[t]he suppression of that which is true, by one having knowledge or belief of the fact." *See* Cal. Civ. Code § 1572(3).

73.     Defendant Clients on Demand's actually fraudulent acts were committed with the connivance of a party to the User Agreement with the intent to induce Plaintiff to enter the User Agreement.

74.     Acting in reliance on these misrepresentations, Plaintiff entered into the User Agreement with Defendant Clients on Demand.  He would not have entered this contract were it not for Defendants' intentional, malicious, and utterly false representations about the nature, scope, and likely benefits of the services Clients on Demand would provide.

CLASS ACTION COMPLAINT

75. Plaintiff suffered injury as a result of his reliance on Defendants' fraudulent misrepresentations insofar as he paid $9,000.00 to Clients on Demand that he would not have paid were it not for Defendants' representations regarding the nature, scope, and likely benefits to Plaintiff of the services it would provide.

76. Plaintiff is informed and believes that the fraudulent conduct alleged herein was committed, authorized, or ratified by Defendant Clients on Demand's officers, directors, or managing agents.

77. Defendant Ruffino is liable for the fraudulent acts committed as alleged herein insofar as he himself committed some of them and insofar as, with respect to all of them, he is the alter-ego of Defendant Clients on Demand.

## SECOND CAUSE OF ACTION

## VIOLATIONS OF THE SELLER ASSISTED MARKETING PLAN ACT

### (Against Clients on Demand)

78. Defendant Clients on Demand's sale of access to its Eight-Week Program is a "seller assisted marketing plan" ("SAMP") because it is the sale of "services that requires a total initial payment exceeding five hundred dollars ($500), but requires an initial cash payment of less than fifty thousand dollars ($50,000), that will aid a purchaser or will be used by or on behalf of the purchaser in connection with or incidental to beginning, maintaining, or operating a business" and Clients on Demand has both advertised its SAMP (the Program) and has also: (1) "[r]epresented that the purchaser [of its Eight-Week Program] will earn, is likely to earn, or can earn an amount in excess of the initial payment paid by the purchaser for participation in the seller assisted marketing plan." *See* Cal. Civ. Code § 1812.201(a)(1).

79. Defendant Clients on Demand's sale of access to its Eight-Week Program is also a "seller assisted marketing plan" ("SAMP") because it is the sale of "services that requires a total initial payment exceeding five hundred dollars ($500), but requires an initial cash payment of less than fifty thousand dollars ($50,000), that will aid a purchaser or will be used by or on behalf of the purchaser in connection with or incidental to beginning, maintaining, or operating a business" and Clients on Demand has both advertised its SAMP (the Program) and has also:

(1) "[r]epresented that there is a market for . . . anything, be it tangible or intangible, made, produced, fabricated, grown, bred, modified, or developed by the purchaser using, in whole or in part, the product, supplies, equipment, or services that were sold or leased or offered for sale or lease to the purchaser by the seller assisted marketing plan seller." *See* Cal. Civ. Code § 1812.201(a)(2).

80. Defendant Clients on Demand is a "seller" as that term is defined in California Civil Code section 1812.201(d)(1), because it sells a seller assisted marketing plan and, on information and belief, has sold more than five seller assisted marketing plans in the 24-months preceding its solicitation of Plaintiff.

81. Client on Demand's sale of a SAMP to Plaintiff occurred in California insofar as Plaintiff communicated his acceptance of Clients on Demand's offer to enroll in its Eight-Week program to a seller located in the State of California (Defendant Clients on Demand).

82. Under California Civil Code section 1812.203, a SAMP seller "shall pay an annual fee in the amount of one hundred dollars ($100) and annually file with the Attorney General a copy of the disclosure statements required under Sections 1812.205 and 1812.206, as well as a list of the names and resident addresses of those individuals who sell the seller assisted marketing plan on behalf of the seller."

83. On information and belief, Defendant Clients on Demand has violated California Civil Code section 1812.203 by failing to pay the fee required by California Civil Code section 1812.203 and by failing to file with the Attorney General of California a copy of the disclosure statements required under Sections 1812.205 and 1812.206, as well as a list of the names and resident addresses of those individuals who sell the seller assisted marketing plan on behalf of the seller.

84. Under California Civil Code section 1812.204(b), in selling or offering to sell a SAMP in California, sellers shall not "[u]se the phrase 'buy-back' or 'secured investment' or similar phrase orally or in writing when soliciting, offering, leasing, or selling a seller assisted marketing plan unless there are no restrictions or qualifications whatsoever preventing or limiting a purchaser from being able to invoke the 'buy-back' or 'secured' portion of the seller

assisted marketing plan contract at any time the purchaser desires during the one-year period following the contract date."

85.    Defendant Clients on Demand violated California Civil Code section 1812.204(b) using the phrase "guaranteed" to describe the putative "refund" supposedly available to purchasers of Clients on Demand's SAMP for whom the Program did not "work" insofar as, in selling its SAMP, Defendant stated that "if you do decide that you want our help to implement this game plan, the whole thing is guaranteed.  Again, if it doesn't work for you, not only will [Defendant Ruffino] refund every penny you spend with [Defendant Ruffino], but I [Defendant Ruffino] will also cut you a check for $5000 and I [Defendant Ruffino] will become your next high ticket client myself."  These representations violate California Civil Code section 1812.204(b) because, as alleged herein, there are myriad restrictions and qualifications placed on the ability of the purchasers of Clients on Demand's SAMP to invoke this guarantee.

86.    Under California Civil Code section 1812.204(d), a SAMP seller may not "[r]epresent that the seller assisted marketing plan provides income or earning potential of any kind unless the seller has data to substantiate the claims of income or earning potential."  The statute provides that "[a] mathematical computation of the number of sales multiplied by the amount of profit per sale to reach a projected income figure is not sufficient data to substantiate an income or earning potential claim."

87.    Clients on Demand represented that its SAMP provided significant earning potential insofar as it, for example, told prospective SAMP purchasers they could hire it to build them a coaching business in which they could "start bringing in $50,000 a month, then $100,000 a month, then more" and insofar as its advertisements routinely foreground the stories of former clients who earn thousands of dollars a month when, on information and belief, the experiences of the featured clients are not representative at all.  Clients on Demand, through its officer Defendant Ruffino, also represented its SAMP conferred earning potential by asking prospective SAMP purchasers to let Defendant Ruffino turn their "expertise into an online coaching business that generates you $100,000 (or more) every month."  On information and

belief, Clients on Demand does not have data substantiating these representations and, as such, violated California Civil Code section 1812.204(d) by making them.

88.     Under California Civil Code section 1812.204(f), in selling or offering to sell a SAMP in California, sellers shall not "[p]lace or cause to be placed any advertisement for a seller assisted marketing plan which does not include the actual business name of the seller, and if it differs, the name under which the seller assisted marketing plan is operated and the street address of the principal place of business of the seller."

89.     Defendant Clients on Demand violated California Civil Code section 1812.204(f) by selling its SAMP through mass marketing emails from the email address russ@russruffino.com that do not include the actual business name of the seller (Clients on Demand) and do not include the street address of Defendant Clients on Demand's principal place of business.  These mass marketing emails—which link to a website that funnels prospective purchasers into calls with Clients on Demand's SAMP telemarketers—feature the name "Russ Ruffino" and an address (100 Caruso Ave, Glendale, CA 91210) that is not Clients on Demand's principal place of business.

90.     Defendant Clients on Demand similarly violated California Civil Code section 1812.204(f) by omitting the address of its principal place of business from SAMP advertisements on its website as well as its advertisements on various other social media platforms such as Facebook and TikTok.

91.     Under California Civil Code section 1812.205, SAMP sellers must, "[a]t the first in-person communication with a potential purchaser or in the first written response to an inquiry by a potential purchaser, whichever occurs first, wherein the seller assisted marketing plan is described" provide prospective SAMP purchasers with a written disclosure document. California Civil Code section 1812.205(a)-(g) provides specific requirements for the information that must be contained in this disclosure document.

92.     Defendant Clients on Demand violated California Civil Code section 1812.205 by failing to provide Plaintiff, and on information and belief all members of the Class, with the disclosure document required by that section in the manner and at the time required by that

section.

93.    Under California Civil Code section 1812.206, "[a]t least 48 hours prior to the execution of a seller assisted marketing plan contract or agreement or at least 48 hours prior to the receipt of any consideration, whichever occurs first, the seller or his or her representative shall provide to the prospective purchaser in writing a document entitled 'SELLER ASSISTED MARKETING PLAN INFORMATION SHEET.'"  California Civil Code section 1812.206 contains specific requirements about what must be contained in the SAMP information sheet.

94.    Defendant Clients on Demand violated California Civil Code section 1812.206 by failing to provide Plaintiff, and on information and belief all members of the Class, with the information sheet required by that section in the manner and at the time required by that section.

95.    California Civil Code section 1812.209 sets forth specific language and information which must be included in any SAMP contract.  This includes: (1) language alerting purchasers that they have the right to cancel the contract within three days, which must be in bold and immediately above the signature line; (2) the seller's principal business address and the name and the address of its agent, other than the Secretary of State, in the State of California authorized to receive service of process; and (3) a statement which accurately sets forth a purchaser's right to void the contract under the circumstances and in the manner set forth in subdivisions (a) and (b) of Section 1812.215. *See* Cal. Civil Code § 1812.209(b), (d), (h).

96.    Defendant Clients on Demand violated California Civil Code section 1812.209 by omitting the information required by subsections (b), (d), and (h) of that statute from its User Agreement, which is a contract for the sale of a SAMP.

97.    Under California Civil Code section 1812.215, "[i]f a seller uses any untrue or misleading statements to sell or lease a seller assisted marketing plan, or fails to comply with Section 1812.203, or fails to give the disclosure documents or disclose any of the information required by Sections 1812.205 and 1812.206, or the contract does not comply with the requirements of this title, then within one year of the date of the contract at the election of the purchaser upon written notice to the seller, the contract shall be voidable by the purchaser and unenforceable by the seller or his assignee as contrary to public policy and the purchaser shall

be entitled to receive from the seller all sums paid to the seller when the purchaser is able to return all equipment, supplies or products delivered by the seller . . . ."

98. Pursuant to California Civil Code section 1812.215, because of Clients on Demand's use of misleading statements to market its SAMP and violations of section 1812.203, 1812.205, and 1812.206, the User Agreement is voidable by Plaintiff and all other members of the Voidable SAMP Contract Subclass.

99. Plaintiff and the Class were injured and lost money as a result of Defendant Clients on Demand's violations of the SAMP Act insofar as they were induced to pay thousands of dollars for Defendant's SAMP but were not provided the required disclosures and information sheet, were not informed of their right to cancel the User Agreement as provided by law, were subjected to representations regarding the earning potential of SAMP purchasers that were not substantiated by data, had their right to invoke Defendant Client on Demand's "Full Refund plus $5,000" guarantee impeded by onerous conditions, and were otherwise denied "the information necessary to make an intelligent decision regarding seller assisted marketing plans being offered" as a result of Defendant Clients on Demand's violations of the SAMP Act. *Cf.* Cal Civ Code § 1812.200(b).

100. As purchasers injured by Clients on Demand's violations of the SAMP Act, Plaintiff and the Class may bring an action for recovery of damages and are entitled to actual damages plus reasonable attorney's fees and costs; additionally, if the trial court deems it proper, Plaintiff and the Class are also entitled to punitive damages for Defendant's violations of the SAMP Act. *See* Cal Civ Code § 1812.218.

101. Defendant Ruffino is liable for the Clients on Demand's violations of the SAMP Act as alleged herein insofar as he is the alter-ego of Defendant Clients on Demand.

## THIRD CAUSE OF ACTION

## VIOLATION OF CALIFORNIA'S CONSUMERS LEGAL REMEDIES ACT

### (Against both Defendants)

102. Plaintiff incorporates all preceding and subsequent paragraphs by reference as if set forth fully herein.

103.    The Consumer Legal Remedies Act ("CLRA") prohibits deceptive practices in connection with the conduct of a business that provides goods, property, or services primarily for personal, family, or household purposes.

104.    Clients on Demand and Defendant Ruffino violated California Civil Code section 1770(a)(5), which prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have," by falsely advertising that Clients on Demand's Eight-Week Program was a DONE-FOR-YOU program through which Clients on Demand would provide a comprehensive suite of business services to Class members and do "the heavy lifting" for Class Members and otherwise had characteristics that it did not have. Clients on Demand and Defendant further violated California Civil Code section 1770(a)(5) by: (1) falsely representing that the services provided by Clients on Demand through its Eight Week Program would "remove all chance of failure" and make it likely, if not guaranteed, that members of the Class would earn thousands of dollars a month through the coaching businesses that Clients on Demand would build for them; and (2) representing that the Program was sold with a risk-free guaranty and that if it didn't "work," purchasers could get a full refund plus a $5,000.00 check from Defendant Ruffino.

105.    Clients on Demand violated California Civil Code section 1770(a)(7), which prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another," by falsely advertising that Clients on Demand's Eight-Week Program was a DONE-FOR-YOU program through which Clients on Demand would provide a comprehensive suite of business services to Class members and do "the heavy lifting" for Class Members and otherwise had characteristics that it did not have. Defendants further violated California Civil Code section 1770(a)(7) by: (1) falsely representing that the services provided by Clients on Demand through its Eight Week Program would "remove all chance of failure" and make it likely, if not guaranteed, that members of the Class would earn thousands of dollars a month through the coaching businesses that Clients on Demand would build for them; and (2) representing that the Program was sold with a risk-free

guaranty and that if it didn't "work," purchasers could get a full refund plus a $5,000.00 check from Defendant Ruffino.

106. Clients on Demand violated California Civil Code section 1770(a)(9), which prohibits "[a]dvertising goods or services with intent not to sell them as advertised," by deceptively and misleadingly using false statements about the nature, scale, scope, and value of the services which would be undertaken on behalf of consumers who enrolled in its Eight-Week Program in order to sell that program. At the time Defendants made these misrepresentations, they knew or should have known that they were false and misleading.

107. Clients on Demand violated California Civil Code section 1770(a)(19), which prohibits "[i]nserting an unconscionable provision in the contract," by inserting a contractual provision imposing copious and significant limitations and restrictions on Program purchasers' ability to invoke the "guaranteed" refund Clients on Demand offered in its advertising materials when such limitations were prohibited by the SAMP Act.

108. Defendant Clients on Demand and Defendant Ruffino have profited from the sale of the Clients on Demand Eight-Week Program to Plaintiff and the Class using the above false, deceptive, and unlawful means.

109. Plaintiff and the Class purchased the Clients on Demand Eight-Week Program for personal use in reliance on Defendants' false, deceptive, and misleading advertising for the program as described herein.

110. The actions underlying these CLRA claims emanate from California and the policies and approaches animating these CLRA claims were formulated in and controlled by Defendants in California. Additionally, both Defendants are California citizens and the User Agreement for Clients on Demand's Eight-Week Program provides: "This Agreement and any disputes relating to this Agreement shall be governed and construed in accordance with the laws of the United States of America and the State of California, without regard for its conflicts of laws principles."

111. Pursuant to California Civil Code section 1780(d), Plaintiff has filed his affidavit of venue contemporaneously with this Class Action Complaint.

112.    As a direct and proximate result of Defendants' violations of the CLRA, Plaintiff and the Class have suffered irreparable harm and seek injunctive relief prohibiting further violations of the CLRA in the form of an order enjoining Defendants from engaging in false, deceptive, or misleading advertising. Plaintiff and the Class also seek to recover their attorneys' fees and costs.

113.    Under California Civil Code section 1782(d), a plaintiff may without prior notification file a complaint alleging violations of the CLRA that seeks injunctive relief only. If the plaintiff later sends a CLRA notification letter and the defendant does not remedy the CLRA violations within thirty days of the notification, then the plaintiff may amend its CLRA causes of action to add claims for damages.

114.    Plaintiff will send Clients on Demand and Defendant Ruffino a CLRA notification letter after the filing of this Class Action Complaint and Plaintiff intends to amend the Class Action Complaint to add claims for damages for Defendants' violations of the CLRA after the thirty-day period has elapsed in the event that the CLRA violations that are identified above are not remedied.

### FOURTH CAUSE OF ACTION

### VIOLATION OF CALIFORNIA'S FALSE ADVERTISING LAW

#### (Against both Defendants)

115.    Plaintiff incorporates all preceding and subsequent paragraphs by reference as if set forth fully herein.

116.    Pursuant to California's False Advertising Law ("FAL"), it is unlawful to sell services through advertising "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading, or . . . to so make or disseminate or cause to be so made or disseminated any such statement as part of a plan or scheme with the intent not to sell that personal property or those services, professional or otherwise, so advertised at the price stated therein, or as so advertised." Cal. Bus. & Prof. Code § 17500.

117.    Clients on Demand and Defendant Ruffino have violated the FAL in particular as

described herein through their false, deceptive, and misleading representations about the nature, scope, and likely benefits of Clients on Demand's Eight-Week Program.  These include representations about offering a "DONE-FOR-YOU" program where Clients on Demand would do the "heavy lifting" for Program participants, about the amount of money purchasers of the Program were likely to earn by hiring Clients on Demand, and about the guaranteed full refund and $5,000.00 payment.

118.    Defendants also misled consumers by omitting material information concerning the Clients on Demand Eight-Week Program that they were under a duty to disclose to Plaintiff and the Class concerning the limited nature and extent of the putative "coaching" and "done for you" services Defendants actually provide, the *likely* financial benefits (or losses) incurred by Program participants, and the copious restrictions and limitations placed on purchasers' ability to secure a refund of monies paid for the Program if it did not "work" for them.

119.    Clients on Demand and Defendant Ruffino knew, or by the exercise of reasonable care should have known, that their representations and omissions were false, deceptive, and misleading, and Plaintiff is informed and believes they deliberately made the aforementioned representations and omissions to deceive reasonable consumers like Plaintiff and the Class.

120.    As a direct and proximate result of Defendants' violations of the FAL, Plaintiff and the Class have suffered injury in fact and have lost money. Plaintiff and the Class reasonably relied on the Defendant Ruffino and Defendant Clients on Demand's false, deceptive, and misleading representations about the nature, scope, and likely benefits of the Clients on Demand Eight-Week Program. Plaintiff purchased the Clients on Demand Eight-Week Program in reliance on these false, deceptive, and misleading representations, and he would not have purchased the Program or would have paid less for the Program had he been aware that these representations were false, deceptive, and misleading. Plaintiff and the Class ended up purchasing a program that was overpriced, inaccurately marketed, and lacking the characteristic, quality, and value promised by the Defendant Ruffino and Defendant Clients on Demand, and Plaintiff and the Class have therefore suffered injury in fact.

121.    Defendant Ruffino and Defendant Clients on Demand's representations about the nature, scope, and likely benefits of the Clients on Demand Eight-Week Program were material to the decision of Plaintiff and the Class to purchase the Clients on Demand Eight-Week Program, and a reasonable person would have attached importance to the truth or falsity of the representations made by Clients on Demand in determining whether to purchase the Clients on Demand Eight-Week Program. With respect to the omissions by Clients on Demand as described herein, those omissions were material, and Plaintiff would have behaved differently if the information had been disclosed. Had Clients on Demand disclosed the omitted information, Plaintiff would not have purchased the Clients on Demand Eight-Week Program or would have paid much less for the Clients on Demand Eight-Week Program than he actually did.

122.    The representations and omissions underlying this FAL claim emanate from California and were formulated and controlled by Defendants in California. Additionally, both Defendants are California citizens and the User Agreement for Clients on Demand's Eight-Week Program provides: "This Agreement and any disputes relating to this Agreement shall be governed and construed in accordance with the laws of the United States of America and the State of California, without regard for its conflicts of laws principles."

123.    The misleading and false advertising described herein presents a continuing threat to Plaintiff, the Class, and the Public in that Clients on Demand and Defendant Ruffino, on information and belief, persist and continue to engage in these practices and will not cease doing so unless and until forced to do so by this Court. Defendant Ruffino and Defendant Clients on Demand's conduct will continue to cause irreparable injury to consumers unless enjoined or restrained. Plaintiff and the Class are entitled to injunctive relief ordering Clients on Demand and Defendant Ruffino to cease engaging in false, deceptive, and misleading advertising, and Plaintiff and the Class are entitled such portion of Defendant Ruffino and Defendant Clients on Demand's revenues associated with their false, deceptive, and misleading advertising or such portion of those revenues as this Court may find equitable.

124.    Defendant Ruffino is liable for the violations of the FAL committed as alleged herein insofar as he himself made representations that violate the FAL and insofar as, with

respect to representations made by Clients on Demand but not specifically by Defendant Ruffino, Defendant Ruffino is the alter-ego of Defendant Clients on Demand.

## FIFTH CAUSE OF ACTION

## VIOLATION OF THE UNFAIR AND FRAUDULENT PRONGS OF CALIFORNIA'S UNFAIR COMPETITION LAW

### (Against both Defendants)

125.    Plaintiff and the Class incorporate all preceding and subsequent paragraphs by reference as if set forth fully herein.

126.    Plaintiff and the Class bring this claim under the "unfair" and "fraudulent" prong of California's Unfair Competition Law ("UCL").

127.    The UCL prohibits "unfair competition," which includes any "unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." *See* Cal. Bus. & Prof. Code § 17200.

128.    Clients on Demand committed "unfair" and "fraudulent" business acts or practices by, among other things: (A) engaging in conduct where the utility of such conduct, if any, is outweighed by the gravity of the consequences to Plaintiff and the Class, (B) engaging in conduct that is immoral, unethical, oppressive, unscrupulous, or substantially injurious to Plaintiff and the Class, and (C) engaging in conduct that undermines or violates the spirit or intent of the consumer protection laws as alleged in this Class Action Complaint.

129.    The utility of the conduct committed by Defendants as described herein is nonexistent. There is no utility in making false, deceptive, and misleading representations to Plaintiff and the Class regarding the Clients on Demand Eight-Week Program that Defendants sell. By contrast, the harm to Plaintiff and the Class by this conduct is significant. Indeed, Defendant Ruffino and Defendant Clients on Demand's conduct as described herein induced Plaintiff to spend thousands of dollars on the Clients on Demand Eight-Week Program.

130.    Defendant Ruffino and Defendant Clients on Demand's conduct as described herein offends established public policies. Additionally, the Defendant Ruffino and Defendant Clients on Demand's conduct as described herein, and in detail in the other Cause of Actions,

violated civil statutes. Those statutes exist for a reason, namely, to protect consumers from unfair and fraudulent practices in the consumer marketplace.

131.    Defendant Ruffino and Defendant Clients on Demand's conduct as described herein is immoral, unethical, oppressive, and unscrupulous, as well as substantially injurious to Plaintiff and the Class.

132.    Defendant Ruffino and Defendant Clients on Demand's conduct as described herein violates the letter, spirit, and intent of the UCL and the consumer protection laws set forth in the other Causes of Action.

133.    Plaintiff is informed and believes that Defendant Clients on Demand and Defendant Ruffino were aware that their representations to Plaintiff and the Class were false, deceptive, and misleading, and Defendants had an improper motive in making these false, deceptive, and misleading representations to Plaintiff and the Class insofar as such representations were motivated by their desire to profit off of the sale of the Clients on Demand Eight-Week Program.

134.    There were reasonably available alternatives to further Defendant Ruffino and Defendant Clients on Demand's legitimate business interests other than the conduct described herein. For example, Defendants could have removed the false and misleading representations from their advertisements and provided omitted information to Plaintiff and the Class to avoid any deception, and Clients on Demand and Defendant Ruffino could similarly have complied with the law rather than violating various consumer protection statutes as described in this Complaint.

135.    As a direct and proximate result of Defendant Ruffino and Defendant Clients on Demand's violations of the UCL, Plaintiff and the Class have suffered injury in fact and have lost money. Plaintiff and the Class reasonably relied on the Defendant Ruffino and Defendant Clients on Demand's false, deceptive, and misleading representations regarding the Clients on Demand Eight-Week Program. Plaintiff and the Class purchased the Clients on Demand Eight-Week Program in reliance on these false, deceptive, and misleading representations, and they would not have purchased the program or would have paid less for the program had they been

aware that these representations were false, deceptive, and misleading. Plaintiff and the Class ended up purchasing a program that was overpriced, inaccurately marketed, and lacking the characteristic, quality, and value promised by Defendant Ruffino and Defendant Clients on Demand, and Plaintiff and the Class have therefore suffered injury in fact.

136.    Defendant Ruffino and Defendant Clients on Demand's representations were material to the decision of Plaintiff and the Class to purchase the Clients on Demand Eight-Week Program, and a reasonable person would have attached importance to the truth or falsity of the representations made by Defendants in determining whether to purchase the Clients on Demand Eight-Week Program. With respect to the omissions by Clients on Demand and Defendant Ruffino, as described herein, those omissions were material, and Plaintiff and the Class would have behaved differently if the information had been disclosed. Had Clients on Demand disclosed the omitted information, Plaintiff and the Class would not have purchased the Clients on Demand Eight-Week Program or would have paid much less for the Clients on Demand Eight-Week Program than they actually did.

137.    As purchasers and consumers of Defendant Clients on Demand's Eight-Week Program who have suffered injury in fact and lost money as a result of this unfair and fraudulent conduct, Plaintiff and the Class are entitled to bring this action and seek all available remedies under the UCL.

138.    The actions, conduct, and representations underlying this UCL claim emanate from California and were formulated and controlled by Defendants in California.  Additionally, both Defendants are California citizens and the User Agreement for Clients on Demand's Eight-Week Program provides: "This Agreement and any disputes relating to this Agreement shall be governed and construed in accordance with the laws of the United States of America and the State of California, without regard for its conflicts of laws principles."

139.    The unfair and fraudulent conduct of Clients on Demand as described herein presents a continuing threat to Plaintiff and the Class in that, on information and belief, Clients on Demand and Defendant Ruffino persist and continue to engage in these practices and will not cease doing so unless and until forced to do so by this Court. Defendant Ruffino and Defendant

Clients on Demand's conduct will continue to cause irreparable injury to consumers unless enjoined or restrained. Plaintiff and the Class are entitled to injunctive relief ordering Clients on Demand and Defendant Ruffino to cease engaging in false, deceptive, and misleading advertising, and Plaintiff and the Class are entitled such portion of Defendant Clients on Demand's revenues associated with Defendants' false, deceptive, and misleading advertising or such portion of those revenues as this Court may find equitable.

140.    Defendant Ruffino is liable for the violations of the UCL committed as alleged herein insofar as he himself committed them and insofar as he is the alter-ego of Defendant Clients on Demand.

### SIXTH CAUSE OF ACTION

### VIOLATION OF THE UNLAWFUL PRONG OF CALIFORNIA'S UNFAIR COMPETITION LAW

### (Against Clients on Demand)

141.    Plaintiff and the Class incorporate all preceding and subsequent paragraphs by reference as if set forth fully herein.

142.    Plaintiff and the Class bring this claim under the "unlawful" prong of California's Unfair Competition Law.

143.    The UCL prohibits "unfair competition," which includes any "unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." *See* Cal. Bus. & Prof. Code § 17200.

144.    Clients on Demand violated Section 5 of the FTC Act, the Telemarketer Sales Rule, the Business Opportunity Rule, and the SAMP Act.  Each of these violations was a violation of the UCL's unlawful prong.

145.    The unlawful acts and practices underlying this UCL claim emanate from California and were formulated and controlled by Defendants in California.  Additionally, both Defendants are California citizens and the User Agreement for Clients on Demand's Eight-Week Program provides: "This Agreement and any disputes relating to this Agreement shall be governed and construed in accordance with the laws of the United States of America and the

State of California, without regard for its conflicts of laws principles."

146.    Legal damages are inadequate and injunctive relief is necessary to ensure that Clients on Demand does not continue engaging in the unlawful conduct herein alleged.

147.    Defendant Ruffino is liable for these violations as the alter ego of Clients on Demand.

### Section 5 of the FTC Act

148.    Under Section 5 of the FTC Act, "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce" are unlawful. *See* 15 U.S.C. § 45.

149.    "An act or practice is deceptive if first, there is a representation, omission, or practice that, second, is likely to mislead consumers acting reasonably under the circumstances, and third, the representation, omission, or practice is material. Deception may be found based on the 'net impression' created by a representation." *FTC v. Stefanchik*, 559 F.3d 924, 928 (9th Cir. 2009) (cleaned up).

150.    Defendants made various **representations** regarding the nature of the services available to consumers through Clients on Demand's Eight-Week Program and the nature of the refund and payment available to purchasers of that program for whom the program did not "work."  These include:

a.    That is was a "DONE-FOR-YOU" program;

b.    That Clients on Demand would do the "heavy lifting" and remove any chance of failure for its clients;

c.    That Clients on Demand would provide its clients with a "100% turnkey" online coaching business;

d.    That those who hired Clients on Demand would be able to earn thousands of dollars a month like "clockwork" without lifting a finger;

e.    That if a consumer tried Clients on Demand's video-centric approach to online sales and it did not "work" for them by generating profits for them, that consumer would be entitled to a $5,000.00 check in addition to a refund;

      f.   That Defendant Ruffino would provide any purchaser of the program with a full refund plus a $5,000.00 check *just* for trying out Defendants' video-centric approach to online sales.

151.   These misrepresentations are, as alleged above, **likely to mislead consumers acting reasonably under the circumstances** because they are likely to lead consumers to believe that Clients on Demand will do all of the legwork involved in building a business for them and that they can get a no-strings-attached full refund and $5,000.00 check if they do not earn significant amounts of money as a result of hiring Clients on Demand. As alleged above, Clients on Demand neither does all of such work nor offers such refunds and payments to its customers.

152.   As alleged above, the above misrepresentations are also material and are likely to impact how a reasonable consumer evaluated the benefits, risks, and potential upside of enrolling in Clients on Demand's Eight-Week Program.

153.   Because these misrepresentations by Defendant Ruffino and Defendant Clients on Demand violate Section 5 of the FTC Act they are unlawful and, by extension, constitute a violation of the UCL under the unlawful prong.

## Telemarketer Sales Rule

154.   The Telemarketing Sales Rule ("TSR"), 16 C.F.R. section 310.3, protects consumers from fraudulent, deceptive, and abusive telemarketing sales practices.

155.   Under the TSR, "[i]t is a deceptive telemarketing act or practice and a violation of [the TSR] for any seller or telemarketer to" misrepresent "directly or by implication, in the sale of goods or services" a "material aspect of the performance, efficacy, nature, or central characteristics of goods or services that are the subject of a sales offer." 16 CFR 310.3(a)(2)(iii).

156.   Defendant Clients on Demand, through its agent, who was a "seller" as that term is defined in 16 CFR 310.2(dd), violated 16 CFR 310.3(a)(2)(iii) by misrepresenting material aspects of the performance, efficacy, nature and central characteristics of its Eight-Week Program to Plaintiff.

157.   Under the TSR, "[i]t is a deceptive telemarketing act or practice and a violation

of [the TSR] for any seller or telemarketer to" misrepresent "directly or by implication, in the sale of goods or services" a "material aspect of the nature or terms of the seller's refund, cancellation, exchange, or repurchase policies." *See* 16 CFR 310.3(a)(2)(iv).

158.    Defendant Clients on Demand, through its agent, who was a "seller" as that term is defined in 16 CFR 310.2(dd), violated 16 CFR 310.3(a)(2)(iv) by misrepresenting material aspects of its refund policy to Plaintiff insofar as Clients on Demand did not inform Plaintiff of the myriad limitations and conditions placed on its refund policy in a conspicuous manner.

## **Business Opportunity Rule**

159.    The FTC's Business Opportunity Rule dictates specific requirements with which sellers of "business opportunities" must comply.

160.    A "business opportunity" includes a commercial arrangement in which:

> (1) A seller solicits a prospective purchaser to enter into a new business; and
> (2) The prospective purchaser makes a required payment; and
> (3) The seller, expressly or by implication, orally or in writing, represents that the seller or one or more designated persons will:
> . . .
>> (ii) Provide outlets, accounts, or customers, including, but not limited to, Internet outlets, accounts, or customers, for the purchaser's goods or services . . . .

*See* 16 CFR 437.1(c)(3)(ii).

161.    Plaintiff had never run a group coaching program or offered webinar-based coaching before being persuaded by Defendants to pursue a "business opportunity" as an online group coaching entrepreneur.

162.    Defendants specifically advertised that their business opportunity (which involved webinar and online-based group coaching) could be beneficial for complete "newbies."

163.    Defendants advertised that in exchange for a required payment to Clients on Demand, Defendants would help novice entrepreneurs like Plaintiff grow successful group online coaching programs by providing Internet customers to them. Specifically, Defendants advertised that Clients on Demand's team would implement their video-based group coaching strategy so that Plaintiff and the Class could "bring in new clients like clockwork at $5,000 to

$10,000 prices or more" without having to "to lift a finger."

164.    The Business Opportunity Rule places limits on the ability of the seller of a business opportunity to make "earnings claims," or "any oral, written, or visual representation to a prospective purchaser that conveys, expressly or by implication, a specific level or range of actual or potential sales, or gross or net income or profits." *See* 16 C.F.R. § 437.1(f). The Rule specifies that "earnings claims" include "[a]ny statements from which a prospective purchaser can reasonably infer that he or she will earn a minimum level of income (e.g., "earn enough to buy a Porsche," "earn a six-figure income," or "earn your investment back within one year")." *Id* at (f)(2).

165.    Under the Business Opportunity Rule, it is a violation of the Rule and an unfair or deceptive practice for a seller to "[m]ake any earnings claim to a prospective purchaser, unless the seller . . . [h]as a reasonable basis for its claim at the time the claim is made." 16 C.F.R. § 437.4(a)(1).

166.    As alleged herein, Defendant Clients on Demand and Defendant Ruffino each violated the Business Opportunity Rule by making earnings claims to Plaintiff and the Class without having a "reasonable basis for its claim at the time the claim is made."

167.    Under the Business Opportunity Rule, it is an unfair or deceptive practice for a seller to make and earnings claim to a prospective purchaser unless the seller "[f]urnishes to the prospective purchaser an earnings claim statement." 16 C.F.R. § 437.4(a)(4). Under the Rule:

> [t]he earnings claim statement shall be a single written document and shall state the following information:
>
>> (i) The title "EARNINGS CLAIM STATEMENT REQUIRED BY LAW" in capital, bold type letters;
>> (ii) The name of the person making the earnings claim and the date of the earnings claim;
>> (iii) The earnings claim;
>> (iv) The beginning and ending dates when the represented earnings were achieved;
>> (v) The number and percentage of all persons who purchased the business opportunity prior to the ending date in paragraph (a)(4)(iv) of this section who achieved at least the stated level of earnings;

(vi) Any characteristics of the purchasers who achieved at least the represented level of earnings, such as their location, that may differ materially from the characteristics of the prospective purchasers being offered the business opportunity; and

(vii) A statement that written substantiation for the earnings claim will be made available to the prospective purchaser upon request.

16 C.F.R. § 437.4(a)(4)(i)-(vii).

168.    Defendants violated 16 C.F.R. section 437.4(a)(4) by making earnings claims without furnishing to Plaintiff and, on information and belief, the Class an earnings claim statement as required by 16 C.F.R. section 437.4(a)(4).

169.    Under the Business Opportunity Rule, it is unlawful and an unfair and deceptive act or practice for a seller to make any earnings claim in the general media unless the seller "[h]as a reasonable basis for its claim at the time the claim is made" and "[s]tates in immediate conjunction with the claim: (i) The beginning and ending dates when the represented earnings were achieved; and (ii) The number and percentage of all persons who purchased the business opportunity prior to the ending date in paragraph (b)(3)(i) of this section who achieved at least the stated level of earnings." 16 C.F.R. § 437.4(b)(1), (3).

170.    As alleged herein, Defendants violated the Business Opportunity Rule by making earnings claims in the general media without having a reasonable basis for those claims at the time they were made.  Defendants also violated the Business Opportunity Rule by making earnings claims without stating in immediate conjunction with those claims the beginning and end dates when they were achieved and the "number and percentage of all persons who purchased the business opportunity prior to the ending date in paragraph (b)(3)(i) of this section who achieved at least the stated level of earnings."

171.    These violations of the Business Opportunity Rule constitute unlawful acts and, by extension, are violations of the UCL.

172.    As a direct and proximate result of Defendant Ruffino and Defendant Clients on Demand's unlawful conduct in violation of the UCL, Plaintiff has suffered injury in fact and has lost money.

173.    As purchasers and consumers of Defendant Ruffino and Defendant Clients on

Demand's Clients on Demand's program who have suffered injury in fact and lost money as a result of this unlawful conduct, Plaintiff and the Class are entitled to bring this action and seek all available remedies under the UCL.

174.    The unlawful conduct of Clients on Demand as described herein presents a continuing threat to Plaintiff, the Class, and the Public in that, on information and belief, Clients on Demand and Defendant Ruffino persist and continue to engage in these practices and will not cease doing so unless and until forced to do so by this Court. Defendant Ruffino and Defendant Clients on Demand's conduct will continue to cause irreparable injury to consumers unless enjoined or restrained. Plaintiff is entitled to injunctive relief ordering Clients on Demand to cease engaging in false, deceptive, and misleading advertising, and Plaintiff and the Class are entitled such portion of the Defendant Ruffino and Defendant Clients on Demand's revenues associated with their false, deceptive, and misleading advertising or such portion of those revenues as this Court may find equitable.

<strong><u>The SAMP Act</u></strong>

175.    As alleged above, Defendant Clients on Demand has violated California's SAMP Act.

176.    Defendant Clients on Demand's violation of the SAMP Act is an unlawful act and, as such, a violation of the UCL under the "unlawful" prong.

<strong><u>SEVENTH CAUSE OF ACTION</u></strong>

<strong>BREACH OF EXPRESS WARRANTY</strong>

<strong>(Against Clients on Demand)</strong>

177.    In contracting to purchase Defendant Clients on Demand Eight-Week Program, Plaintiff contracted to purchase material and labor from Defendant Clients on Demand insofar as Plaintiff was told he was hiring Clients on Demand to build a website for him and to construct for him a marketing pipeline, replete with a customized video.

178.    Clients on Demand made express warranties concerning the website and fully-implemented "client attraction" system it would build for Plaintiff.  Specifically, it expressly warranted that these goods and services would eliminate any chance of failure for Plaintiff's

38<br>CLASS ACTION COMPLAINT

coaching business and guarantee that Plaintiff could earn large amounts of money each month by selling to the clients attracted to his business by the website, video, and client attraction system he was buying from Defendants.

179.    These representations were affirmative representations of fact which became part of the basis of the bargain between Plaintiff and Defendant Clients on Demand.

180.    Defendant Clients on Demand breached its express warranties by failing to provide Plaintiff with any website, video, or fully-implemented client-attraction system, let alone with a website, video, and fully-implemented client attraction system that would enable him to earn thousands of dollars a month by enrolling clients into his coaching business.

181.    It is not reasonable to construe the disclaimers contained within the User Agreement as consistent with the express warranties extended by Defendant Clients on Demand and those disclaimers should, therefore, be disregarded.

182.    Plaintiff and the Class were injured by Defendant Clients on Demand's breach of express warranty insofar as the material and labor they received from Clients on Demand had a lower value and was of a lesser utility than that they would have received had Clients on Demand honored its express warranty.

183.    Defendant Ruffino is liable for Defendant Clients on Demand's breach of express warranty under the alter-ego theory of liability.

## EIGHTH CAUSE OF ACTION

### BREACH OF CONTRACT

### (Against Clients on Demand)

184.    Defendant Clients on Demand offered, in exchange for $9,000.00, to do all of the heavy lifting necessary to build Plaintiff a robust client-attraction system, including the work involved in developing a website and promotional video for Plaintiff; Defendant represented that the system it would build for Plaintiff was of the sort that would guarantee Plaintiff financial success in his coaching business and that, if Plaintiff contracted with it, it would remove all chance of failure.  Clients on Demand told Plaintiff that the benefits of bargaining with it would be very great.  Specifically, it told him that he could expect to earn "$50,000 a

CLASS ACTION COMPLAINT

month, then $100,000 a month, then more" if he hired Clients on Demand to build him the website, video, administrative and technological infrastructure he needed to enroll high-ticket coaching clients into the group-based online coaching program Clients on Demand would build for him.

185.    Plaintiff accepted this offer, paid Clients on Demand $9,000.00, and otherwise fulfilled, or substantially fulfilled, all of his contractual obligations to Clients on Demand, or his performance was excused.

186.    Clients on Demand breached its contract with Plaintiff by failing to build him a "100% turnkey" coaching business and failing to do all of the technical and logistical legwork necessary such that Plaintiff could receive a high-ticket group coaching sales platform and pipeline that "without lifting a finger" would enable him to make thousands of dollars a month through group coaching.

187.    Plaintiff was injured by Clients on Demand's breach of contract insofar as he has lost out on the $9,000.00 he paid to Clients on Demand for goods and services he did not receive. Plaintiff also suffered expectation damages insofar as he has not been earning the $50,000.00 to $100,000.00 a month that he would have earned if Clients on Demand had provided him with a fully built-out client-attraction system that conformed with all of the advertising representations made by Clients on Demand about the client-attraction capacities of the system it was selling Plaintiff.

188.    Defendant Ruffino is liable for Defendant Clients on Demand's breach of contract under the alter-ego theory of liability.

**PRAYER FOR RELIEF**

Wherefore, Plaintiff and the Class request that this Court:

A.    Certify the Class as defined herein;

B.    Appoint Plaintiff Kendrick Davis as Representative of the Class, the No-Refund or Payment Subclass, and the Voidable SAMP Contract Subclass;

C.    Appoint the undersigned as class counsel;

D.    Declare that Defendant Ruffino and Defendant Clients on Demand's actions are

unfair and unlawful;

E.    Issue injunctive relief as permitted by law and equity, including, but not limited to, an order prohibiting Clients on Demand and Defendant Ruffino from advertising Clients on Demand's Eight-Week Program as offering a "done-for-you" or "turnkey" coaching business and an order prohibiting Clients on Demand from engaging in unfair, deceptive, and misleading advertising as set forth herein;

F.    Award damages in favor of Plaintiff and the Class on their claims in an amount to be proven at trial, including actual damages, consequential and incidental damages, and punitive damages;

G.    Award restitution and/or other equitable relief, including, without limitation, disgorgement of all revenues, profits, and unjust enrichment that Defendants obtained from Plaintiff and the Class as a result of their unfair, fraudulent, and unlawful business practices as described herein;

H.    Award attorneys fees' and costs;

I.    Award pre-judgment and post-judgment interest as provided for by law and allowed in equity; and

J.    Such other and further relief as is necessary and appropriate.

## **DEMAND FOR JURY TRIAL**

Plaintiff and the Class demand a jury trial of the facts alleged above and on all counts and issues so triable.

DATED: December 15, 2023.                    Respectfully submitted,

**KNEUPPER & COVEY, PC**

A. Lorraine Weekes, Esq.

*Attorney for Plaintiff Kendrick Davis and the Class*

**CONSUMERS LEGAL REMEDIES ACT VENUE DECLARATION**

I, Kendrick Davis, do hereby declare as follows:

1.  I am over eighteen years of age and of sound mind and body.

2.  I am the Plaintiff in this matter and have specifically brought a claim for violation of California's Consumers Legal Remedies Act.

3.  Based on the following facts, I believe that the Central District of California is a proper place to bring my California Consumers Legal Remedies Act claim:

    a.  Clients on Demand has its principal place of business at 340 S Lemon Ave #7370, Walnut, California 91789, a location within the Central District of California.

    b.  Both Defendants are doing business in the Central District of California.

    c.  I am informed and believes that Russell Ruffino resides in the Central District of California.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct to the best of my knowledge.

Date: 10/24/2023

*Kendrick B. Davis, Sr.*

Verified by signNow
10/24/2023 21:30:50 UTC
f1b7332e7177451ba287

Signature of Declarant